NOTICE
Decision filed 06/22/20. The text
of this decision may be changed
or corrected prior to the filing of
a Petition for Rehearing or the
disposition of the same.

2020 IL App (5th) 190114-U

NO. 5-19-0114

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under
Supreme Court Rule 23 and
may not be cited as precedent
by any party except in the
limited circumstances allowed
under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 15-CF-45 |
| | ) | |
| JERAD W. PEOPLES, | ) | Honorable |
| | ) | Mark W. Stedelin, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WHARTON delivered the judgment of the court.
Justices Overstreet and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the trial court was presented with information of the defendant's whereabouts on the morning of trial, the trial court's decision to proceed to trial *in absentia* without conducting an adequate inquiry into evidence before it that the defendant was hospitalized constituted an abuse of discretion. Where the defendant's hospital medical records support the existence of preexisting and cute psychiatric diagnoses coupled with an acute acetaminophen overdose, the defendant presented sufficient information supporting his claim that his absence was not willful. Where the trial court was not required to advise the defendant of the possible sentencing range at arraignment, the trial court's incorrect information about the sentencing range does not require that the defendant is not entitled to relief. Where the defendant was unable to establish ineffective assistance of counsel based on an alleged incorrect explanation of the applicable sentencing range at arraignment, the defendant is not entitled to relief. We vacate the defendant's conviction and sentence because his absence was not willful, and the trial court abused its discretion in failing to conduct an adequate inquiry.

¶ 2    The defendant, Jerad W. Peoples, was charged with four counts of predatory criminal sexual assault of a child under the age of 13 (720 ILCS 5/11-1.40(a)(1) (West 2012)) in January 2015 by the

1

Marion County State's Attorney. In exchange for a waiver of his right to a jury trial, the State dismissed three of the four counts. The defendant was tried *in absentia* and convicted on August 30, 2017. His motion to vacate the conviction was denied. The defendant appealed before sentencing, and we dismissed the appeal for lack of jurisdiction on January 17, 2018. The trial court sentenced the defendant to 35 years of imprisonment on April 19, 2018. The defendant filed two posttrial motions. The first motion asked the trial court to reconsider his sentence. The second posttrial motion asked the trial court to vacate his conviction. The trial court denied both motions on March 11, 2019. The defendant appeals from this order.

¶ 3                                      BACKGROUND

¶ 4                       Allegations, Investigations, and Charges

¶ 5     On approximately January 3, 2015, the Illinois Department of Children and Family Services (DCFS) received notification about an allegation involving the defendant and a six-year-old female named L.K. L.K. informed her friend at a sleepover that she had engaged in sexual intercourse with her "stepfather"—the defendant. The mother of L.K.'s friend contacted DCFS. DCFS interviewed L.K.'s mother who said that she did not believe her daughter because she had recently been acting out and seeking attention after the birth of a sibling.

¶ 6     On January 9, 2015, L.K. was interviewed by a staff member at the Amy Schultz Child Advocacy Center (Amy Center). The interview was videotaped and played for the jury at the defendant's trial.

¶ 7     L.K.'s mother was the defendant's significant other. Throughout the Amy Center interview, L.K. referred to male and female genitalia as a "wrong spot." She informed the interviewer that the defendant touched her wrong spot at various times while they lived together in two different locations. More specifically, L.K. stated that the defendant made her put her mouth on his wrong

2

spot and that sometimes white stuff would come out in her mouth and she did not like the taste of the white stuff; that something like white "pee" came out of the defendant's wrong spot after she touched it; that the defendant referred to the white "pee" as "medicine"; that the defendant licked his fingers before touching her wrong spot; that sometimes the defendant put his mouth on her body and his tongue on her wrong spot and that he would move his tongue back and forth on her wrong spot and that his tongue would be inside her body; that the defendant made her watch videos of adults involved in sexual activities; and that after each encounter the defendant made her wash her hands and brush her teeth.

¶ 8    During the Amy Center interview, L.K. stated that she told her friend that she had had sex with her "stepfather." She also told her mother and her friend's parents. Initially, L.K.'s mother did not believe that the defendant had engaged in the sexual activity L.K. described.

¶ 9    L.K. underwent a medical examination that did not reveal physical evidence of sexual abuse.

¶ 10    On January 14, 2015, the State charged the defendant with four counts of predatory criminal sexual assault of a child. Predatory criminal sexual assault of a child is a Class X felony. Count I alleged that between February 2011 and December 2013, the defendant committed an act of sexual penetration by placing his penis into contact with the mouth of a minor under the age of 13. Count II alleged that between February 2011 and December 2013, the defendant committed an act of sexual penetration with a minor under the age of 13 years by placing his mouth into contact with the minor's vagina. Count III alleged that between October 2014 and January 2015, the defendant committed an act of sexual penetration with a minor under the age of 13 in that he placed his penis into contact with the minor's mouth. Count IV alleged that between October 2014 and January 2015, the defendant committed an act of sexual penetration with a minor under the age of 13 years by placing his mouth into contact with the minor's vagina.

3

¶ 11                                    Arraignment

¶ 12    The defendant was arraigned on these four charges on January 14, 2015. During the arraignment, the trial court advised the defendant that each of the four charges was a Class X felony for which he "could be sentenced to incarceration in the Department of Corrections from 6 to 30 years" plus a 3-year period of mandatory supervised release. The trial court then asked the assistant state's attorney if these charges were "the ones that could go to life?" The assistant state's attorney responded that consecutive sentence on all the charges were mandatory and that the mandatory supervised release was from three years to life.

¶ 13                            Waiver of Right to Jury Trial

¶ 14    On August 3, 2017, the defendant waived his right to a trial by jury on the advice of counsel. In exchange for the defendant's waiver, the State dismissed three charges against him. The remaining charge was count III—which alleged that the defendant's penis came into contact with L.K.'s mouth between October 2014 and January 2015.

¶ 15    At the hearing, the trial court explained to the defendant that if he failed to appear at the bench trial later in August 2017, he would be tried *in absentia*. The trial court explained that the defendant's attorney would attempt to represent him if he did not appear for the bench trial, but that the defendant would be foregoing certain rights. The defendant confirmed to the trial court that he understood.

¶ 16    At the time of the waiver, the defendant claims that he believed he could not be sentenced for more than 30 years on one count—that the sentencing range was 6 to 30 years. The defendant's claims are based upon incorrect sentencing range information received at arraignment from the trial court and allegedly from his attorney. The defendant's attorney does not remember the precise conversation he had with the defendant but stated that he would not dispute the defendant's claim

4

that he provided misinformation about the maximum sentence as most felonies were capped at 30 years. Instead, each count carried a possible sentence of up to 60 years in prison. 720 ILCS 5/11-1.40(b)(1) (West 2012).

¶ 17                                    Pretrial Hearing

¶ 18    On August 29, 2017, the trial court held a pretrial hearing. The defendant and his attorney were present. The defendant's attorney requested a continuance because the defendant wanted to hire a new attorney to represent him at trial. The defendant explained that the day before he had a meeting with his attorney. He believed that the purpose of the meeting was to discuss trial strategy. Instead, the defendant informed the court that he felt he was being pressured by his attorney—that his attorney had lost confidence in the defendant's innocence and his ability to defend him on the charge. The defendant explained that he wrote down questions and then called his attorney later in the evening, stating that he could not make this life-altering decision until he had answers to his questions. The defendant stated that his attorney could not answer some of the questions which left him with the belief that his attorney was unprepared for trial.

¶ 19    In response, the State argued that the case had been pending for over two years; that this was a special setting; and that although there may have been a breakdown in the relationship between the defendant and his attorney, the defendant's attorney was still competent to defend him.

¶ 20    The trial court denied the defendant's motion for a continuance and denied his attorney's request to withdraw. The court advised the defendant and his attorney that the trial would begin as scheduled the following morning. To conclude the hearing, the court asked the defendant if he "understood when [he was] due back here?" The defendant answered in the affirmative.

¶ 21                                   The Trial

¶ 22    On August 30, 2017, the defendant did not appear for trial. The defendant's attorney was present. He stated that he had spoken to the defendant the night before, that the defendant was nervous, and that the defendant's mother was in a hospital. The attorney did not know where the defendant was that morning. Some members of the defendant's family were present in the courtroom and they too had no knowledge of the defendant's whereabouts. The attorney contacted the hospital where the defendant's mother was hospitalized to ascertain whether the defendant was there, but the hospital would not release patient information (we note that the disclosure of individually identifiable medical information is prohibited under both federal and state law. See 42 U.S.C. § 1320d-6 (2012); 740 ILCS 110/3 (West 2016)). He then asked the trial court for a continuance and asked for leave to withdraw as the defendant's attorney. The State objected and noted that the defendant was informed by the trial court at the pretrial hearing to appear in court for trial at 8:30 a.m. the next morning. The State also asked the trial court to review the transcript of the jury trial waiver hearing of August 3, 2017, in order to review the *in absentia* warnings provided to the defendant. The court denied both motions made by the defendant's attorney; concluded that the defendant had received *in absentia* warnings on August 3, 2017; and concluded that the defendant's trial should begin. In making this ruling, the court noted that the defendant is "not in the hospital as far as we know."

¶ 23                              Testimony of L.K.

¶ 24    The minor, L.K., was called to testify. On the date of trial, L.K. was nine years old and was in the fourth grade. L.K. described living in three homes—one in Olney and the other two in Central City. The defendant was the former boyfriend of L.K.'s mother and is the father of L.K.'s younger brother. The defendant lived with L.K. and her mother in both Central City homes, but the defendant

6

only "hurt" her in one of the two homes. She testified that she only remembered that the defendant touched her "bad spot" at one of the Central City homes that she identified as the log cabin house. L.K. confirmed that the term "bad spot" meant her vagina. She testified that the defendant touched her vagina with his hand more than once. The defendant touched her under her clothing. If she had underwear on, L.K. testified that the defendant touched her bad spot over her underwear. She testified that she did not remember that she ever touched the defendant.

¶ 25                    Testimony of Stephanie Brooks

¶ 26    Stephanie Brooks, a friend of L.K.'s mother, testified. She had known L.K. since she was in preschool and had known the defendant since high school. In January 2015, Brooks lived in Centralia with her ex-wife, Kayla Booth. Booth had parenting time with her two children that included alternate weekends. Brooks testified that on a weekend in early January 2015 there was a sleepover at her home that included L.K. and Booth's daughter. The next morning, Booth's daughter brought L.K. out of the bedroom to tell Brooks something. Brooks testified that L.K. began crying and was visibly upset, but eventually informed her that the defendant had been doing "bad things" to her. Brooks then asked L.K. for clarification of whether the defendant was doing the bad things to L.K. or if L.K. was being forced to do bad things to the defendant. L.K. informed Brooks that she had been touching the defendant's bad areas, and that he had been touching her bad areas which L.K. indicated was her vagina. L.K. then repeated these sexual allegations to Booth. The women told L.K. that they needed to inform her mother, that she would not be in trouble, and that they would make sure that she was safe. One of the women called L.K.'s mother. The other woman called DCFS to report the allegation. L.K. spent Saturday night with Brooks and Booth because DCFS advised that L.K. could not be near the defendant.

¶ 27    On cross-examination, Brooks confirmed that she knew a woman by the name of Mary Tullis. She later testified that she had known Tullis for approximately 13 years. During the previous summer, Brooks and Tullis went to Florida together for approximately two weeks. Brooks does not remember telling Tullis about the sexual allegations against the defendant, but believed she referenced the defendant as the reason she asked Tullis to take her to Florida. Brooks explained that at the time of the Florida trip, she was then living with a woman by the name of Ashley Algood. Algood had announced her intentions of moving the defendant into her home. Brooks believed this to be a "conflict of interest," and so asked Tullis to take her to Florida. Brooks stated that Tullis's son was the defendant's friend and so Tullis was aware of L.K.'s allegations. Brooks also acknowledged that she dated both the defendant and Tullis's son at separate times during high school. Brooks had remained friends with Tullis through the years even though her relationship with Tullis's son did not work out. Brooks testified that she had not seen Tullis since Florida—approximately one year prior to her testimony. They had a falling out while in Florida resulting in Tullis dropping Brooks off and leaving her stranded in Panama City Beach. Brooks testified that she was aware that Tullis was saying that she and Booth told L.K. to make these sexual allegations against the defendant. She was also aware that Tullis informed investigators that both Brooks and Booth had "issues" with the defendant because he refused to be intimate with both. She denied the truth of these allegations.

¶ 28                            Testimony of Kayla Booth

¶ 29    The State next called Kayla Booth as a witness. In January 2015, Booth lived in Centralia with her ex-wife, Brooks. She had known L.K.'s mother since high school. She testified that she knows the defendant and L.K. through L.K.'s mother. Booth has a daughter who is the same age as L.K. In early January 2015, L.K. spent the night at Booth's home. The next morning, Brooks came

8

to tell her that L.K. made allegations of sexual contact with the defendant. Booth and Brooks together then spoke with L.K. assuring her that she was safe and that she was not in trouble for telling them what had happened to her. Booth testified that L.K. told her that the defendant touched her between her legs. At that point, she and Brooks called L.K.'s mother and DCFS. L.K. then spent another night at Booth's home.

¶ 30    On cross-examination, Booth denied telling L.K. what words to use if she was questioned about what had happened with the defendant. Booth testified that she did not previously feel animosity towards the defendant. Booth admitted that she had been sexually intimate with the defendant in a situation that also involved L.K.'s mother and Brooks. She denied that the purpose of the sexual encounter with the defendant was for her or Brooks to get pregnant.

¶ 31                                    Testimony of Cara D.

¶ 32    The State next called Cara D. (Cara), L.K.'s mother, to testify. At the time of trial, Cara had two children: L.K. who was then nine and W.P. who was then two. The defendant was W.P.'s father. Cara testified that her relationship with the defendant began in 2010 when L.K. was two. They remained together as a couple for six years. Cara testified that she had worked at Industrial Tavern, an establishment in Centralia, and that she had lived in two different Centralia homes during the time of that employment—the first was a trailer and the second was a log cabin next door to Industrial Tavern. While she was at work, the defendant watched L.K. At some point in time, Cara stopped working at Industrial Tavern and began working at a Centralia restaurant called Central Park. This change in jobs occurred during her pregnancy with W.P. Cara testified that when she worked at Central Park, the defendant watched L.K.

¶ 33    Cara confirmed that she learned about the defendant's sexual abuse of her daughter from Brooks and Booth. Shortly thereafter, she took L.K. to the Amy Center in Mt. Vernon. L.K. began

9

seeing a counselor after the Amy Center appointment and on the date of trial was still engaged in counseling services. Cara testified that initially she had difficulty in believing L.K. She explained that she did not know "where [she] had missed that," noting that although L.K. had a propensity to lie at that time, L.K. was not having any difficulties at school or at home.

¶ 34                           Testimony of Tonya Arnold

¶ 35    The State called Tonya Arnold to testify. In January 2015, Arnold was employed as a forensic interviewer at the Amy Center. A forensic interviewer is trained to conduct interviews of child victims who allege sexual or physical abuse. Arnold interviewed L.K. on January 9, 2015. L.K. was six years of age when she was interviewed. The interview was videotaped. During the interview, L.K. told Arnold that the defendant touched her "wrong spot" at various times in two of the homes they shared. Before touching her "wrong spot," L.K. stated that the defendant licked his fingers. She also informed Arnold that the defendant made her put her mouth on his "wrong spot," which she alternatively referred to as his "wiener." In addition, she stated that something that looked like white colored "pee" came out of his "wrong spot" after she touched it on one occasion. The defendant referred to this white "pee" as "medicine." L.K. explained that the "white stuff" went into her mouth. The first time that the defendant placed his penis in L.K.'s mouth, it was at night and her mother was working at the bar. L.K. said that the curtains were closed, and the door was locked. L.K. informed Arnold that she had not wanted to place her mouth on the defendant's penis but stated that he pushed her head towards his penis. She described the defendant's penis as hard and not moving. L.K. stated that the defendant's penis touched inside her mouth, including her teeth and tongue. After each oral contact with the defendant's penis, he made L.K. wash her hands and brush her teeth. L.K. said that afterwards, the defendant would wipe himself with a towel. L.K. also told Arnold that the defendant made her watch videos of adults having sexual relations.

¶ 36                                    Testimony of Mary Tullis

¶ 37    The defendant's attorney called Mary Tullis to testify. Tullis was then living in Centralia and was unemployed. She testified that she had known the defendant and Brooks since they were in high school. She knew that Booth had been married to Brooks, but otherwise did not know her. Tullis testified that she had always been a maternal figure to Brooks. During the summer of 2016, Brooks reached out to Tullis by Facebook and text message. Brooks told Tullis that she was divorced from Booth, who had abused her. She also told her that she had recently become remarried, that she had just lost a baby, and that she needed to get away from Centralia. Tullis drove from Panama City Beach, Florida, to pick up Brooks and her new husband and take them back to Florida. At that time, Tullis was not aware that the defendant had been charged with this crime. However, she later testified that she had heard a rumor that the defendant was in trouble for "messing with a kid" but was unaware that he had been arrested.

¶ 38    After a few days in Florida, Tullis and Brooks began talking about people they knew from Centralia. During this conversation, Brooks told Tullis that they "got" the defendant "really good." Tullis asked what that meant. Brooks proceeded to tell Tullis that she and Booth wanted to have a baby and that the defendant refused to have sexual relations with them for that purpose. Because the defendant was unwilling to impregnate one of the women, they devised this scheme to get him in trouble. Tullis testified that Brooks said they had L.K. with them for two days and that they were able to "drill her" with sexual information, including a description of the defendant's penis and by showing her sexual photographs. Tullis said that the story made her physically ill and she informed Brooks that she could not listen to these stories any longer.

¶ 39    Upon her return to Centralia, Tullis reached out to the defendant's grandfather to tell him what she knew. She met with the defendant's investigator and was interviewed.

¶ 40                    Motion for Continuance During Trial

¶ 41    The defendant's attorney again asked the court for a continuance. While no one knew where the defendant was that day, he had informed his attorney that he intended to testify in his own defense. The trial court denied the request, noting that the defendant was advised of the possibility that he could be tried *in absentia* and had been informed the day before trial that he was to appear the next morning.

¶ 42                              The Verdict

¶ 43    In finding that the defendant was guilty of the crime charged, the trial judge noted that he had listened to all testimony, and reviewed exhibits, including the Amy Center interview video. Based upon his observations of the persons testifying, he concluded that L.K. could not have been coached to make the precise sexual allegations in that her responses were detailed. While Brooks and Booth may have had a relationship with the defendant in the past, based upon their in-court testimony, the court found that neither witness demonstrated an animus against the defendant. Similarly, the court found that L.K. did not demonstrate animus against the defendant in her testimony. The court concluded that Tullis's testimony was not credible.

¶ 44                    Posttrial Motions, Hearing, and Appeal

¶ 45    On September 6, 2017, the defendant filed a motion to vacate the *in absentia* conviction, stating that he was absent from trial because he had been admitted to St. Mary's Hospital in Centralia at 4:50 a.m. on August 30, 2017 (the day of trial), and was not discharged until August 31, 2017, at 8:07 a.m.

¶ 46    In support of the motion to vacate the *in absentia* conviction, the defendant attached a copy of his St. Mary's Hospital admission record and other hospital records, summarized as follows. The defendant arrived at the St. Mary's Emergency Room at 3:23 a.m. and informed emergency room

staff that he had taken "a bunch of sleeping pills in the last 20 minutes." The record lists the chief complaint as "drug overdose." The defendant was admitted to the intensive care unit at the hospital. The defendant was listed as having a history of a bipolar I disorder, depression, and suicidal ideation. The emergency room providers noted that the defendant was "intoxicated," and was walking unsteadily and exhibiting signs of anxiety and agitation. The defendant reported that he had ingested acetaminophen, diphenhydramine, and benzodiazepine. The ingestion amount was unknown. In a review of the defendant's systems, he was positive only for having cardiovascular palpitations. Upon physical exam, the defendant's blood pressure and pulse rate were elevated. The provider noted that the defendant had superficial cuts to both of his arms. Blood tests were ordered. His blood ethyl alcohol level and acetaminophen levels were elevated. The physician noted that although the defendant was lethargic, his vital signs were stable. The acetaminophen level was going to be repeated in four hours and he was to have a gastroenterology consult due to the risk of liver damage. The final diagnoses were an accidental or unintentional drug overdose, an acetaminophen overdose, and intentional self-harm. While hospitalized, he received medication to reduce the possibility of liver damage from the acetaminophen overdose. A urine drugs-of-abuse test conducted while he was hospitalized only showed a positive result for cannabinoids. At discharge, the defendant's ethyl alcohol and acetaminophen levels had dropped to normal levels.

¶ 47    On September 20, 2017, the defendant's motion to vacate the *in absentia* conviction was called for a hearing. The defendant's hospital records from August 30 through August 31, 2017, were entered into evidence. Three witnesses were called to testify.

¶ 48    The first witness called to testify was Detective Ryan Castleman of the Marion County Sheriff's Office. Detective Castleman testified that at 3:15 a.m. on August 30, 2017, he was outside the entrance of the St. Mary's Hospital Emergency Room in Centralia working on an unrelated case.

13

A silver vehicle entered the parking lot and parked, a male exited the vehicle, and the male walked into the emergency room. Detective Castleman thought that the male was the defendant, but he was not close enough to be able to make a positive identification. Later at about 3:40 a.m., Detective Castleman entered the hospital and walked past one of the emergency room trauma rooms and definitively identified the male occupant as the defendant. His room was guarded by two security guards. He did not know why the security guards were present.

¶ 49    Next, Detective Anthony Decker of the Marion County Sheriff's Office testified. On the morning of trial when the defendant did not appear for trial, he advised the defendant's attorney, the assistant state's attorney, and the trial judge that his coworker, Detective Castleman, had seen the defendant in the emergency room early that morning. He testified that the defendant's attorney made at least two telephone calls to St. Mary's Hospital, but he was unable to obtain specific information about the defendant's hospital admission and care. After the trial court entered the defendant's conviction, a warrant for the defendant's arrest was issued. Detective Decker contacted St. Mary's Hospital to advise that he had a warrant for the defendant's arrest. Because of the warrant, a St. Mary's Hospital official was able to confirm that the defendant was admitted to the hospital. Detective Decker went from the courthouse to the defendant's hospital room to tell him that they would be taking him into custody. While he was in the defendant's hospital room, a physician came in to ask the defendant questions about his acetaminophen intake the day before. The defendant informed the physician that he did not know how many pills he had taken.

¶ 50    The defendant's fiancée, Tracy Lundgren (Lundgren), testified. She learned that the defendant was at St. Mary's Hospital from the defendant's stepfather. The defendant's stepfather had been at the defendant's trial. After the trial concluded, the defendant's stepfather went to St. Mary's Hospital to visit his wife. Upon arriving at his wife's hospital room, he learned that the defendant

14

was in the room across the hall. He contacted Lundgren to tell her that he had found the defendant. Lundgren then drove to the hospital to be with the defendant and was there when Detective Decker arrived with the warrant for his arrest.

¶ 51    The defendant's attorney argued that the defendant's failure to appear at trial could not be construed as willful because of his suicide attempt while intoxicated and because of his past psychiatric history of bipolar I disorder, depression, anxiety, and suicidal ideations. He also noted that the medical records for the defendant's hospital admission failed to support the State's theory that the hospital admission was planned in order to avoid the trial. Furthermore, because bipolar I disorder, depression, anxiety, and addiction are medical conditions, he argued that the trial court should not find that the defendant forfeited his constitutional rights.

¶ 52    The State countered that because the defendant was voluntarily intoxicated and voluntarily attempted suicide, his failure to appear in court was purposeful and was not due to circumstances beyond his control. The State reminded the court that the defendant was in court the day before his trial, asked for a continuance, asked to be allowed to fire his attorney and hire another one, and was informed that his trial was beginning the next morning and that he needed to be present.

¶ 53    The trial court denied the defendant's motion to vacate his *in absentia* conviction in an order dated September 21, 2017. The court acknowledged that it was made aware on the morning of trial that the defendant had been seen in the intensive care unit at St. Mary's Hospital earlier that morning. However, the trial court dismissed this information by stating that "efforts to confirm admission were unsuccessful." In its order, the trial court noted that the defendant was admonished regarding trial *in absentia* on August 3, 2017; that he was present in court on August 29, 2017, and provided notice of the need to appear at trial the next morning; that at about 11 p.m. on August 29, 2017, the defendant borrowed his fiancée's vehicle; that early on August 30, 2017, the defendant

15

presented himself at the St. Mary's Hospital Emergency Room in an intoxicated and anxiety-ridden state with superficial cuts on both arms claiming that he had taken a bunch of sleeping pills; and that there was no evidence that the defendant attempted to contact his family or his attorney upon hospitalization. Noting that it was clear that the defendant was fearful of going to trial, the trial court concluded that his fear of incarceration alone was insufficient to establish his burden to prove severe emotional or psychological stress. In support, the trial court noted that the medical records only referenced anxiety and agitation. The court stated that the defendant may have been able to establish the severe emotional or psychological stress required if his suicide attempt was legitimate. Instead, the court found that the defendant's suicide efforts were contrived in that he arranged to have a vehicle available four hours before he went to the emergency room, he took an overdose of "Tylenol," and went to the emergency room within 20 minutes of consumption. The court concluded that "Defendant's failure to appear was his fault and within his control."

¶ 54     The defendant appealed immediately, but because he had not yet been sentenced and therefore his judgment was not final, this court dismissed that appeal on January 17, 2018.

¶ 55                    Sentencing, Postsentencing Motions, and Appeal

¶ 56     On April 19, 2018, the defendant was sentenced to 35 years of imprisonment in the Department of Corrections to be followed by 3 years to natural life of mandatory supervised release.

¶ 57     The defendant filed a motion to reconsider sentence on May 14, 2018, claiming that his sentence was outside of the range of which he was admonished. The motion was supported by an affidavit of his attorney. Pursuant to a court order, the defendant then filed a petition to vacate his conviction on October 26, 2018, alleging the incorrect sentencing admonishments. On March 11, 2019, the trial court denied both motions.

¶ 58    The defendant appeals from his *in absentia* conviction and the trial court's denial of his motion to vacate.

¶ 59                                              ANALYSIS

¶ 60    On appeal, the defendant argues three issues. First, he claims that the trial court erred in refusing to vacate his *in absentia* conviction because the court had received information before trial that he was in the intensive care unit of a local hospital. Second, the defendant argues that his constitutional rights were violated because both his attorney and the trial court did not properly admonish him of the correct sentencing range—an error that resulted in a sentence in excess of what he had been advised was possible for the offense charged. Third, the defendant contends that the evidence of sexual penetration was insufficient for a conviction based upon the victim's testimony at trial that the defendant only touched her over her undergarments.

¶ 61    This is a direct appeal from a final criminal judgment. The appeal does not involve the validity of a state or federal statute. We have jurisdiction to hear the defendant's appeal based on Illinois Supreme Court Rules 602 and 603. Ill. S. Ct. R. 602 (eff. May 30, 2018); Ill. S. Ct. R. 603 (eff. Feb. 6, 2013).

¶ 62    In Illinois, a criminal defendant can be tried *in absentia*. 725 ILCS 5/115-4.1(a) (West 2016). However, Illinois courts "do not favor trials *in absentia* and a trial court should be loath to proceed with a trial in a defendant's absence." *People v. Zielinski*, 77 Ill. App. 3d 157, 161, 395 N.E.2d 1020 (1979). A trial held *in absentia* is inherently unfair to a defendant because a defendant is guaranteed the constitutional right to be present at all stages of trial and the right to confront all witnesses. U.S. Const., amend. VI; *People v. Lester*, 165 Ill. App. 3d 1056, 1059, 519 N.E.2d 1127 (1988) (citing *Zielinski*, 77 Ill. App. 3d 157). In addition, a defendant has the right to be of aid in his attorney's cross-examination of witnesses. *People v. Lofton*, 194 Ill. 2d 40, 60, 740 N.E.2d 782 (2000). If a

17

defendant is not present at trial, he has no ability to observe a witness testify and could be prejudiced by his inability to assist his attorney by suggesting areas of cross-examination helpful to his case. *Id.*

¶ 63 If a defendant voluntarily chooses to be absent, then he waives the right to be present. *People v. Smith*, 188 Ill. 2d 335, 341, 721 N.E.2d 553 (1999). The applicable Illinois statute allows a defendant to be tried *in absentia* "after the State has affirmatively proven through substantial evidence that the defendant is willfully avoiding trial." 725 ILCS 5/115-4.1(a) (West 2016). A *prima facie* case of willful absence is established if the State shows that the defendant (1) was advised of his trial date, (2) was advised that the failure to appear could result in a trial *in absentia*, and (3) did not appear for trial. *Smith*, 188 Ill. 2d at 343.

¶ 64 Here, the defendant was in the hospital. From testimony at the hearing on the defendant's motion to vacate his *in absentia* conviction, we know that on the morning of trial, the judge was informed that the defendant was seen in a hospital trauma room earlier that morning. Detective Decker advised the trial court that Detective Castleman saw the defendant in the emergency room at about 3:30 a.m. that morning. However, no one was then aware of the reason for the defendant's presence at the hospital. The defendant's attorney attempted to contact the hospital to ascertain if he was still there. Due to federal and state statutory privacy rights, the hospital could not release information about whether the defendant was a patient in the hospital. Although members of the defendant's family were in the courtroom and did not know the defendant's whereabouts, the trial court did not ask a family member to find out if the defendant was in the hospital.

¶ 65 Here, the defendant was advised of his trial date and time; was advised that his failure to appear could result in a trial *in absentia*; and he did not appear for trial. While these facts are ordinarily sufficient to establish the three elements of a *prima facie* case of willful absence, as set forth in *People v. Smith* (see *Smith*, 188 Ill. 2d at 343), the trial court had before it information

18

suggesting that the defendant's absence was not willful. When the State asks the trial court to proceed with the trial in a defendant's absence, the State must "affirmatively prove[ ] through substantial evidence that the defendant is willfully avoiding trial." 725 ILCS 5/115-4.1(a). In this case, if the trial court had no information about the defendant's whereabouts, the evidence presented by the State may have been sufficient to establish that the defendant's absence was willful. However, upon notification that the defendant was in the hospital, the "willfulness" of the defendant's absence was called into question. At that point, the reason for the defendant's presentation at the hospital was unknown.

¶ 66    We conclude that the State was unable to establish that the defendant's absence was willful in this situation because of the report that the defendant was in the hospital. After Detective Anthony Decker informed the trial judge, the assistant state's attorney, and the defendant's attorney that the defendant had last been seen in a local hospital emergency room, the tenor of the situation changed. While the defendant's attorney attempted to obtain information from the hospital, the hospital was prevented by law from releasing that information. Detective Decker acknowledged that if he had had a warrant, he could have obtained information from the hospital about the defendant's status. Although this case had been given a special setting, this case was set for a bench trial. No jury had been called. Staying the case in order to allow Detective Decker to proceed with a warrant would not likely have caused an extensive delay. Given the information the trial court received the morning of trial, the court should have engaged in additional inquiry to ascertain whether the defendant was in the hospital under guard and was unable to leave the hospital to attend his trial.

¶ 67    We find that two Illinois cases are instructive in this type of situation. In *People v. Wheeler*, 186 Ill. App. 3d 422, 425, 542 N.E.2d 524 (1989), the court expressed its disapproval of the defendant's trial *in absentia* but did not base its reversal for a new trial on that basis. In *Wheeler*, the

19

defendant did not show up for trial because his ride to the courthouse fell through and he was unable to find an alternate ride in time. *Id.* The court noted that it was cognizant of the difficulties and delay that the trial court would have encountered by granting a continuance. *Id.* The court stated, however, "we believe the circuit court here would have been well-advised to seek further information about [the] defendant's situation before proceeding to trial." *Id.* at 426. By contrast, in *People v. Collins*, 109 Ill. App. 3d 1076, 1079-80, 441 N.E.2d 935 (1982), the appellate court concluded that the trial court did not abuse its discretion in trying the defendant *in absentia*. In that case, the state's attorney's office contacted all local hospitals and learned that the defendant was not at any of them. *Id.* at 1080. In addition, the county sheriff's department sent an officer to the defendant's last known address and he was not there. *Id.*

¶ 68     We find that the trial court's decision to try the defendant *in absentia* despite the court's knowledge that the defendant may be hospitalized constituted an abuse of discretion. *People v. Johnson*, 293 Ill. App. 3d 915, 919, 689 N.E.2d 179 (1997) (citing *People v. Sherrod*, 279 Ill. App. 3d 383, 387, 664 N.E.2d 1066 (1996)).

¶ 69     We also conclude that the trial court erred in denying the defendant's motion to vacate his conviction because he successfully rebutted the *prima facie* showing that he was willfully absent. From the defendant's hospital records, the defendant has a history of bipolar I disorder, depression, anxiety, addiction, and suicidal ideation. While in an intoxicated state, the defendant took an overdose of an acetaminophen-based sleeping aid.

¶ 70     While the consumption of excessive alcoholic beverages and a suicide attempt by acetaminophen overdose are characterized by the State and the trial court as voluntary acts which would negate the defendant's claim that his absence was not willful, the scientific and medical communities     characterize     mental     illness     and     alcoholism     as     diseases.     See

20

https://www.psychiatry.org/patients-families/bipolar-disorders/what-are-bipolar-disorders (defining bipolar I as a specific type of brain disorder that causes changes "in a person's mood, energy and ability to function" characterized by severe mood swings with manic and depressive components); American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, DSM-5, at 123-35 (2013); https://www.psychiatry.org/patients-families/depression (defining depression (major depressive disorder) as "a common and serious medical illness that negatively affects how you feel, the way you think and how you act"); DSM-5, at 155-88; https://www.psychiatry.org/patients-families/anxiety-disorders (defining anxiety as a normal reaction to stress and defining anxiety disorder as being different "from normal feelings of nervousness or anxiousness and involv[ing] excessive fear or anxiety"); DSM-5, at 189-233; https://www.psychiatry.org/patients-families/addiction (defining addiction as "a complex condition, a brain disease that is manifested by compulsive substance use despite harmful consequence"); DSM-5, at 481-589.

¶ 71     Furthermore, the acetaminophen overdose could have resulted in liver failure or death, and so the defendant's body was being flushed to bring the acetaminophen levels down. See https://www.poison.org/articles/2008-dec/use-acetaminophen-safely. According to the hospital records, the defendant was asleep until noon after this treatment.

¶ 72     When the defendant was scheduled to be present for trial, he was confined to the intensive care unit with security guards posted at his door, was receiving treatment for acetaminophen poisoning, and was not in control of his actions.

¶ 73     We also disagree with the trial court's reliance upon *People v. Hayes*, 159 Ill. App. 3d 1048, 513 N.E.2d 68 (1987), in ruling against the defendant's motion to vacate his conviction. In *People v. Hayes*, the appellate court held that the defendant was not entitled to a new sentencing hearing. *Id.* at

21

1051-52. In *Hayes*, the defendant was not hospitalized when he missed his sentencing hearing. *Id.* at 1051. Instead, the defendant fled the jurisdiction and traveled to California. *Id.* The defendant had testified that his failure to appear for sentencing was due to a fear of incarceration. *Id.* The court found that simple fear of incarceration was not sufficient to establish that his absence was not his fault or that his absence was due to circumstances beyond his control, without a showing that he was "suffering from extreme psychological or emotional stress or mental illness." *Id.* The court in *Hayes* did not cite any authority for its proposition that a defendant must show proof of extreme psychological or emotional stress or mental illness. Whether that proof is required, *Hayes* is factually different from this case in that here the defendant has a diagnosis and documented history of mental health issues and he was hospitalized and guarded by hospital security at the time of trial. To the extent that a defendant must establish that he was suffering from extreme stress and/or extreme psychological or mental illness, we find that the defendant's medical records would support that standard.

¶ 74    Overall, we find that the trial court abused its discretion in proceeding with the trial in the defendant's absence after learning that the defendant was likely hospitalized. We also conclude that the trial court erred in denying the defendant's motion to vacate his conviction because the State failed to establish that the defendant's absence was willful.

¶ 75    The defendant next argues that his sixth amendment rights were violated because the trial court and his attorney failed to correctly advise him of the applicable sentencing range at issue. Although we vacate the defendant's conviction and sentence, remanding for a new trial, we address this second issue because the outcome of this issue could impact the manner of proceedings upon remand. The defendant contends that the issue is critically important because he made his decision to waive his right to a jury trial because of the incorrect sentencing range. He believed that at worst, he

22

would be sentenced to 30 years in prison for the one remaining charge. The trial court sentenced him to a term in excess of the sentencing range to which he claims to have been admonished.

¶ 76    Before we examine the merits of the defendant's issue involving incorrect admonishments, we note that the defendant claims he only decided to waive his right to a jury trial because of the misinformation he received. Therefore, we must initially determine whether the defendant was aware of the difference between a jury trial and a bench trial. *People v. Bannister*, 232 Ill. 2d 52, 69, 902 N.E.2d 571 (2008). We recognize that an important aspect of a defendant's waiver to his right to a jury trial, "the pivotal knowledge that the defendant must understand—with its attendant consequences—is that the facts of the case will be determined by a judge and not a jury." *Id.* Here, during the August 3, 2017, hearing, the defendant's attorney informed the trial court that he had a conversation with the defendant explaining that it was a decision that the defendant needed to make. The trial court proceeded to question the defendant asking him if he understood his right to waive a jury trial and proceed to a bench trial, and more specifically if he knew the difference between a jury trial and a bench trial. The defendant responded to both questions in the affirmative. The trial court also asked the defendant if anyone had threatened him or made any other promises to him about giving up his right to a trial by jury.  The defendant answered in the negative. Finally, the trial court asked the defendant if he fully understood that by signing the jury trial waiver form, he would no longer have the opportunity "to be judged by 12 of your peers ***." The defendant responded: "Yes, sir." The trial court found that the defendant "made a knowing and voluntary waiver of jury trial." Based upon the record on appeal, we find that in waiving his right to a jury trial, the defendant was aware of the distinction between a jury trial and a bench trial. Accordingly, we turn to the merits of the defendant's constitutional issue.

¶ 77    The sixth amendment to the United States Constitution affords criminal defendants with the right to be reasonably informed of the nature of the charges against them and the right to be effectively represented by counsel at trial. U.S. Const., amend. VI.

¶ 78    The defendant argues that his attorney's representation was ineffective because his attorney informed him of an incorrect sentence range. Constitutionally competent assistance is measured by a test of whether the defendant received "reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on an ineffective-assistance-of-counsel claim, "[the] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Lefler*, 294 Ill. App. 3d 305, 311, 689 N.E.2d 1209 (1998) (citing *Strickland*, 466 U.S. at 694). The term "reasonable probability" has been defined to mean "a probability sufficient to undermine confidence in trial's outcome." *Id.* at 311-12 (citing *Strickland*, 466 U.S. at 687). The fact that professional errors have been committed does not define the question. We always examine the issue from the perspective of whether the defendant received a fair trial, despite an attorney's shortcomings. *Id.* at 312. In that context, a fair trial means "a trial resulting in a verdict worthy of confidence." *Id.* (citing *People v. Moore*, 279 Ill. App. 3d 152, 161-62, 663 N.E.2d 490 (1996)).

¶ 79    At the arraignment, the trial court advised the defendant of the penalties associated with the charges as follows:

> "Now, sir, each of these counts are Class X felonies, and as Class X felonies if convicted you could be sentenced to incarceration in the Department of Corrections from 6 to 30 years. If you went to the Department of Corrections there would be a three year period of mandatory supervised release—or is this one of the ones that could go to life?"

In response, the assistant state's attorney advised that if the defendant was convicted, the sentences would have to be served consecutively and that there would be a period of mandatory supervised release from three years to life.

24

¶ 80    The defendant claims that his attorney advised him of this same sentencing range in a private consultation before the arraignment. His attorney does not remember the contents of his discussion with the defendant, and so does not discredit this possibility.

¶ 81    Instead of a maximum sentence of 30 years on each charge of predatory criminal sexual assault of a child under 13 years of age (a Class X felony), at the time of the defendant's arraignment and trial, he faced a maximum sentence of 60 years on each charge. 720 ILCS 5/11-1.40(b)(1) (West 2012).

¶ 82    While it is clear that an attorney representing a criminal defendant has a duty to inform his client about the potential maximum and minimum sentence that could be imposed for the offenses charged, the trial court does not appear to have a similar obligation at arraignment when the defendant enters a plea of not guilty. See *People v. Harvey*, 366 Ill. App. 3d 910, 918, 853 N.E.2d 25 (2006) (stating that the defense attorney is the proper person to inform a defendant about the applicable maximum and minimum sentence).

¶ 83    In an arraignment, a defendant is called upon by the court to enter a plea. 725 ILCS 5/113-4(a) (West 2016). If a defendant pleads not guilty, the statute requires the trial court to advise the defendant then or at a later court date that if he fails to appear in court for whatever reason, that failure could constitute a waver of his right to confront the witnesses against him and trial could proceed in his absence. *Id.* § 113-4(e). However, if a defendant enters a plea of guilty at the arraignment, then the trial court must fully explain "the maximum and minimum penalty provided by law for the offense which may be imposed by the court." *Id.* § 113-4(c)(1). In summary, if a defendant pleads "not guilty," the trial court is under no obligation to inform the defendant of the maximum and minimum sentence prescribed by law. *Harvey*, 366 Ill. App. 3d at 918 (citing *People v. Jones*, 174 Ill. App. 3d 794, 798, 529 N.E.2d 66 (1988)).

¶ 84     Although we acknowledge that the trial court provided misinformation at the arraignment, we are not able to hold the trial court responsible for this statement, as at that stage of the proceedings, the trial court had no duty to advise the defendant of the applicable maximum and minimum sentence for the charge that the defendant faced. We are also not able to conclude that if the defendant's attorney provided incorrect information to the defendant at arraignment, this "error" factored into the defendant's later decision to waive trial by jury in exchange for dismissal of three of the four charges against him. The defendant seems to equate his waiver of a right to a jury trial with a plea bargain. The factual problem with this argument is that the defendant never pled guilty to the crimes charged. As the trial court noted, the defendant's argument is irrational because the sentencing range would have been the same if the defendant was convicted by a jury or by a judge following a bench trial. Furthermore, the defendant's plea remained a plea of not guilty. The plea was not transformed into a guilty plea simply because he agreed to waive his right to a jury trial.

¶ 85     We find that this case is similar to *People v. Bannister*. In *People v. Bannister*, the defendant elected to waive his right to a jury trial on the charges filed against him. *Bannister*, 232 Ill. 2d at 66. Upon learning that the defendant made this waiver, the trial court then spoke to the defendant about the charges he faced and the potential maximum and minimum sentence. *Id.* The trial court provided incorrect sentence ranges. *Id.* The defendant claimed that his waiver of his constitutional right to a jury trial was not knowing and voluntary because of this sentence misinformation. *Id.* The supreme court found that even if the trial court had given complete and accurate sentencing information, the defendant had no explanation as to how he would have made a different jury trial decision if the information had been accurate. *Id.* at 68. The supreme court explained that when a defendant enters a guilty plea, the trial court must inform the defendant of the potential maximum and minimum sentence in order to " 'give the defendant a more realistic picture of what might happen to him.' "

26

(Emphasis omitted.) *Id.* (quoting 177 Ill. 2d R. 402(a)(2), Committee Comments, at lxxvii). " 'Contrary to the situation with a jury trial waiver, sentencing is a consequence of the acceptance of a guilty plea. Sentencing, however, is not a consequence of the election to waive a jury trial.' " *Id.* at 68-69 (quoting *Horsman v. State*, 82 Md. App. 99, 104, 570 A.2d 354, 357 (1990)). As the supreme court noted, "[a] defendant who pleads not guilty receives a full and fair trial before either a jury or the court sitting without a jury." *Id.* at 69. Whether a jury or a trial judge serves as the trier of fact, "the defendant's possible sentences would be the same." *Id.*

¶ 86    Although the defendant's decision to waive his right to a jury trial was made in exchange for the State's dismissal of three of the four pending charges against him, that agreement does not transform the defendant's "not guilty" plea to a "guilty" plea. As in *Bannister*, even if the trial court had correctly informed the defendant at arraignment of the correct maximum and minimum sentences he faced, the defendant fails to articulate how this would have impacted his decision to have a jury trial on all four charges as opposed to a bench trial on the one charge.

¶ 87    Furthermore, even if we assume that the defendant's attorney also informed the defendant of inaccurate sentence ranges at the arraignment, the defendant has failed to satisfy either of the *Strickland v. Washington* prongs. First, there is a strong presumption that counsel's conduct falls within the wide range of what is considered "reasonable professional assistance." *Strickland*, 466 U.S. at 689. Although the defendant's attorney does not dispute the defendant's claim that he misstated the sentencing range because he does not remember the precise details of his conversation with the defendant, we do not find that the claimed error was so egregious to have deprived the defendant of a fair trial. *People v. Caballero*, 126 Ill. 2d 248, 259-60, 533 N.E.2d 1089 (1989). However, if the defendant is unable to establish the second *Strickland* prong, then whether counsel

was ineffective is moot. *Strickland*, 466 U.S. at 697; *People v. Albanese*, 104 Ill. 2d 504, 527, 473 N.E.2d 1246 (1984).

¶ 88  We conclude that the defendant is not able to establish the second *Strickland v. Washington* prong—that the outcome of the case would have been different. He argues that he would not have accepted the State's proffered deal if he had known the actual sentencing range. However, that claim falls far short of establishing that the outcome would have been different if he had not waived his right to a jury trial and the State proceeded with all four charges against him. *Strickland*, 466 U.S. at 694. The basic truth is that the defendant would have faced the same sentencing range whether he had a bench trial or a jury trial.

¶ 89  We find that the trial court's error in stating an incorrect sentencing range at arraignment would not entitle the defendant to a new trial. Additionally, the defendant would not be entitled to a new trial on the claim that he received ineffective assistance of counsel where his attorney may have misstated the applicable sentencing range at arraignment because the defendant is unable to establish either prong of the *Strickland* test.

¶ 90  Finally, the defendant alleges that the evidence at trial was insufficient to establish his guilt. We decline to address this issue taking into consideration our ruling on the first issue vacating the defendant's conviction and sentence and remanding for a new trial.

¶ 91                                     CONCLUSION

¶ 92  For the reasons stated in this order, we vacate the defendant's conviction and sentence and remand this case to the Marion County circuit court for a new trial.


¶ 93  Conviction and sentence vacated; cause remanded.

28